**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOSE MARGARITO PEREZ-CASTILLO; GLADYS ALBERTINA FUNES ALVARADO,<br><br>*Petitioners*,<br><br>v.<br><br>TODD BLANCHE, Attorney General,<br><br>*Respondent*. | No. 21-70087<br><br>Agency Nos.<br>A029-166-480<br>A072-675-816<br><br>OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted January 17, 2025
San Francisco, California
Submission Vacated January 21, 2025
Argued and Submitted March 16, 2026
Pasadena, California

Filed September 8, 2026

Before: M. Margaret McKeown, Holly A. Thomas, and
Salvador Mendoza, Jr., Circuit Judges. *

Opinion by Judge McKeown

---

* Pursuant to G.O. § 3.2.h, Judge McKeown was randomly drawn as the replacement for District Judge Bolton.

# SUMMARY**


## Immigration

Denying Jose Margarito Perez's petition for review of a decision of the Board of Immigration Appeals that dismissed his appeal from an Immigration Judge's denial of special rule cancellation of removal under the Nicaraguan Adjustment and Central American Relief Act ("NACARA"), the panel held that the persecutor bar contains no implied duress defense.

The persecutor bar makes certain forms of immigration relief unavailable to persons that have, in relevant part, assisted or otherwise participated in persecution on account of race, religion, nationality, membership in a political social group, or political opinion. 8 U.S.C. § 1231(b)(3)(B)(i). In *Negusie v. Holder*, 555 U.S. 511 (2009), the Supreme Court held that the bar is ambiguous about "whether coercion or duress is relevant" to the determination that a noncitizen has "assisted or otherwise participated in persecution." On remand, the BIA recognized a narrow duress defense, *Matter of Negusie* ("*Negusie I*"), 27 I. & N. Dec. 347 (B.I.A. 2018), but the Attorney General later held that the bar contains no duress exception and adopted a burden-shifting framework under which the government makes an initial showing and the applicant must disprove the bar, *Matter of Negusie* ("*Negusie II*"), 28 I. & N. Dec. 120 (A.G. 2020).

The panel concluded that evidence of Perez's ties to the infamous Atonal Battalion in El Salvador raised the


** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

persecutor bar, and he failed to rebut the bar in light of the IJ's adverse credibility determination, which he did not challenge.

The panel explained that whether an implied duress defense nonetheless foreclosed the IJ's decision presented the dispositive issue here. Addressing what weight to give *Negusie II* following *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), the panel accorded it limited weight in light of the agency's change in interpretation without providing a rational explanation for the switch.

The panel concluded that the best reading of the persecutor bar is that it contains no implied duress defense. Looking to the everyday understanding of "assisted" and "otherwise participated" at the relevant times, the panel concluded that an applicant who involuntarily contributed effort in the accomplishment of persecution intended by another may have nonetheless "assisted" in persecution. The panel wrote that Congress's amendments to provisions that neighbor the persecutor bar to include the term, "voluntarily," as well as the panoply of exceptions in other provisions that speak of voluntariness, reinforced the conclusion that Congress's omission in the persecutor bar was no accident.

Perez and amici relied on the relationship between the statutory history of the persecutor bar and international refugee law to support an implied duress defense. The panel concluded that Perez and amici demonstrated why they think that a duress defense may be possible and sensible, but not that it is required or that Congress wrote the defense into law. Because a duress defense would be inconsistent with the statute's plain text, the *Charming Betsy* canon—under which courts may not construe an act of Congress to violate

the law of nations if any other possible construction remains—did not warrant a different conclusion.

In light of the unchallenged adverse credibility determination here, the panel did not address what conduct counts as assistance or participation in persecution, but noted that the absence of a duress defense does not, for example, relieve an IJ of the responsibility to conduct a sufficiently particularized evaluation to determine a petitioner's responsibility for persecution committed by others when the government raises the inference that the petitioner has assisted in persecution.

---

## COUNSEL

Chelsea E. HaleyNelson (argued), HaleyNelson Law PC, Oakland, California, for Petitioners.

Stefanie N. Hennes, Senior Counsel for National Security; Rachel Berman-Vaporis, Trial Attorney; Paul F. Stone, Deputy Chief, National Security Unit; Office of Immigration Litigation; Brian M. Boynton, Acting Assistant Attorney General; Brett A. Shumate, Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

Charles S. Ellison, Immigrant Rights Clinic, Duke University School of Law, Durham, North Carolina; Benjamin C. Sanchez, James H. Binger Center for New Americans, University of Minnesota Law School, Minneapolis, Minnesota; for Amicus Curiae American Immigration Lawyers Association.

Christine Mullen, Legal Intern; Katherine L. Evans; Immigrant Rights Clinic, Duke University School of Law,

Durham, North Carolina; Sabrineh Ardalan and Tiffany Lieu, Harvard Immigration and Refugee Clinical Program, Harvard Law School, Cambridge, Massachusetts; for Amici Curiae Scholars of International Refugee Law.

---

## OPINION

McKEOWN, Circuit Judge:

Jose Margarito Perez seeks review of a decision by the Board of Immigration Appeals ("BIA") affirming the Immigration Judge's ("IJ") denial of his application for special rule cancellation of removal under the Nicaraguan Adjustment and Central American Relief Act ("NACARA"), Pub. L. No. 105–100, §§ 201–04, 111 Stat. 2160, 2198 (Nov. 19, 1997), *amended by*, Pub. L. No. 105–139, 111 Stat. 2644 (Dec. 2, 1997). In its dismissal of Perez's appeal, the BIA relied on the IJ's adverse credibility finding and on the conclusion that Perez's ties to the infamous Atonal Battalion raised NACARA's persecutor bar, which Perez failed to rebut.

Perez's petition requires us to decide what weight to give to the Attorney General's interpretation of the concededly ambiguous persecutor bar, which makes certain forms of immigration relief unavailable to persons who have, in relevant part, assisted or otherwise participated in the persecution of others on account of race, religion, nationality, membership in a political social group, or political opinion. The dispositive issue in this petition is whether the persecutor bar contains an implied duress defense, which, the Attorney General claims, it does not.

As always, we must "exercise [our] independent judgment" and "may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024). Based on our independent interpretation of the statute and recognizing that we can accord some limited weight to the Attorney General's view, we conclude that the persecutor bar contains no implied duress defense. We deny the petition.

## Background

Perez entered the United States in 1988 after completing compulsory military service in El Salvador. He applied for asylum and stated a fear that guerrillas would forcibly recruit him because he had been a member of the Fourth Infantry Brigade of the Salvadoran military for two years. In his asylum materials, Perez recounted that guerrillas had threatened to induct him into their ranks. His wife, Gladys Albertina Funes Alvarado, entered the United States in 1993 and was included in Perez's asylum application.

After a NACARA interview in 2003, the United States Citizenship and Immigration Servies referred Perez's case to the immigration court. At a merits hearing in April 2008, the parties submitted letters confirming Perez's military service in the Fourth Infantry Brigade as a radio operator in the early 1980s. The IJ treated NACARA's requirement of extreme hardship as presumed and identified the dispositive issue as whether Perez's military service disqualified him from relief as a persecutor of others because he had "ordered, incited, assisted, or otherwise participated in the persecution of an individual because of the individual's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(B)(i).

Perez testified that back in 1981, when he was nineteen years old, soldiers came to his tailoring job and forcibly conscripted him into military service. He claimed that he had no alternative and was given only ten to fifteen minutes to call his mother. He was soon assigned to work as a radio operator and trained to use a gun, but claimed that he did not fire his weapon after the training. He claimed that he would go out on patrol with several other soldiers and a sergeant and would operate the radio under the sergeant's direction.

Crucially, Perez also testified that he would occasionally be loaned out to the Atonal Battalion. That battalion was an elite counterinsurgency unit associated with severe human rights abuses during the Salvadoran civil war. Perez testified that he saw combat on two occasions, but that, as the radio operator, he was always in the middle of the group of soldiers and would hear gunshots. He claimed never to have seen anyone be arrested or suffer abuse by his fellow soldiers, but that he occasionally saw injured soldiers and guerrillas.

On cross-examination, the government confronted Perez with discrepancies between his testimony and prior statements to asylum officers, including statements that suggested frequent participation in combat and uncertainty about whether he had shot anyone. Perez admitted to not telling the truth at his asylum interview. He denied capturing guerrillas but explained that his unit (and not his group) had done so. He later also testified that he had seen guerrilla arrests but did not know what had happened to the guerrillas after they were taken to the base. He ultimately admitted to lying to an asylum officer about being part of the Atonal Battalion because he thought that it would "help [him] a lot with [his] political asylum case." He also testified that he had seen combat about forty times and recalled arriving after

a battle and seeing injured men (but was uncertain whether they were guerrillas or civilians). The IJ excused Perez's family from the courtroom out of concern that he was reluctant to testify honestly in front of them. Perez testified that he only fired his weapon in the air, not at people. He also explained that he had seen dead women and children but had not wanted to state so in front of his son in the courtroom.

The IJ denied NACARA relief in March 2009, partly on account of the "many areas of contradiction" in Perez's testimony. The IJ found Perez not credible as to the identity of the battalion to which he was assigned, whether he had ever fired his weapon, whether he had ever been in combat, and whether he had witnessed any human rights abuses. She also found that Perez had established certain baseline facts, including that he served in the military beginning in 1981, was assigned to the Fourth Infantry Brigade, was either on loan to or part of the Atonal Battalion, was issued a weapon that he fired during combat, and witnessed the results of military atrocities. She acknowledged that no particular persecutory event had been identified beyond vague testimony about seeing civilian casualties after the fact, and described that portion of her analysis as "somewhat weaker." She ultimately denied Perez's special rule cancellation application for three reasons: First, "that he has not successfully defended the bar, second, that he was lacking in credibility, and third, that he committed perjury that essentially prohibits him from being granted because he cannot demonstrate good moral character." Perez appealed to the BIA.

In December 2020, the BIA dismissed the appeal and adopted and affirmed the IJ's adverse credibility finding. The BIA held the persecutor bar was sufficiently raised by

Perez's membership in the Atonal Battalion, and this fact then shifted the burden to Perez to prove that the bar did not apply. The BIA then concluded that Perez did not rebut the bar because he was not credible. The BIA also held that even if Perez had been found credible, his duress defense was foreclosed by the Attorney General's decision in *Matter of Negusie* ("*Negusie II*"), 28 I. & N. Dec. 120 (A.G. 2020).

## Analysis

### I. NACARA, the Persecutor Bar, and the *Negusie* Decisions

NACARA provides that Salvadoran citizens living in the United States are eligible for relief from deportation, including special rule cancellation of removal, if they meet certain requirements. NACARA § 203(b). To demonstrate eligibility, the applicant must provide proof of seven years continuous physical presence in the United States at the time of adjudication, good moral character for that period of time, and extreme hardship to the applicant and/or his qualifying family members. 8 C.F.R. § 1240.66(b)(2)–(4). An applicant otherwise eligible for this special form of cancellation of removal loses eligibility if the government demonstrates that:

> the alien ordered, incited, assisted, or otherwise participated in the persecution of an individual because of the individual's race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1231(b)(3)(B)(i); *see also* 8 C.F.R. § 1240.66(a) (stating that an applicant must not be subject to bars to eligibility found, among other places, in

Section 1229b(c)(5), which makes "ineligible for relief" any "alien[s] . . . described in [S]ection 1231(b)(3)(B)(i)"). Courts, the Attorney General, and the BIA call this restriction the "persecutor bar."

The "persecutor bar" describes a collection of provisions and regulations that each make certain forms of immigration relief or protection unavailable to persecutors. *Negusie II*, 28 I. & N. Dec. at 125–26. In particular, the Immigration and Nationality Act ("INA") excludes persecutors from the definition of "refugee" by disqualifying "any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). Nearly identical provisions also expressly bar persecutors from asylum, *id.* § 1158(b)(2)(A)(i), withholding of removal under the INA, *id.* § 1231(b)(3)(B)(i), special rule cancellation of removal under NACARA, *id.*; 8 C.F.R. § 1240.66(a), and withholding of removal under the Convention Against Torture ("CAT"), *see* Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242(c), 112 Stat. 2681-761, 2681-822; 8 C.F.R. § 1208.16(d)(2). Individuals barred from this relief nonetheless remain eligible for deferral of removal under the CAT. 8 C.F.R. §§ 1208.16(c)(4), 1208.17(a).

The interpretation of the persecutor bar has followed a winding course up and down the immigration and federal courts. In 2009, the Supreme Court held that the bar is ambiguous about "whether coercion or duress is relevant" to the determination that a noncitizen has "assisted or otherwise participated in persecution." *Negusie v. Holder*, 555 U.S. 511, 517 (2009). The Court explained that the absence of

language indicating voluntariness—the bar's "silence"—was "not conclusive." *Id.* at 518.

On remand, the BIA recognized a narrow duress defense and adopted a five-part threshold test to assess application of the law. *Matter of Negusie* ("*Negusie I*"), 27 I. & N. Dec. 347, 363 (B.I.A. 2018). This test generally attempted to follow the general duress standard under international criminal law, with a view toward duress under federal law. *Id.* at 357–60, 363–64. Attorney General Sessions then stayed that decision pending his review. *Matter of Negusie*, 27 I. & N. Dec. 481 (A.G. 2018). In 2020, Attorney General Barr vacated the BIA's decision, held that the persecutor bar contains no duress exception, and adopted a burden-shifting framework under which DHS did not need to make an extensive initial showing before the applicant had to disprove the bar. *Negusie II*, 28 I. & N. Dec. at 121, 154–55. In 2021, Attorney General Garland stayed that decision pending review, *Matter of Negusie*, 28 I. & N. Dec. 399 (A.G. 2021), but never issued a new decision. In 2025, Attorney General Bondi vacated the stay and reinstated Attorney General Barr's decision in *Negusie II*. *In re Negusie*, 29 I. & N. Dec. 285, 285–86 (A.G. 2025).

To begin, the government's evidence in this petition "indicate[d]" that the persecutor bar "may apply" to Perez's application. 8 C.F.R. § 1240.8(d). On cross-examination, the government confronted Perez with his contradictory statements about his having shot a weapon and having participated in questioning of civilians about the whereabouts of guerrillas during his service. The government also introduced evidence that the Salvadoran armed forces were engaged in widespread human rights violations against civilians because of their support for guerrillas, that the period of 1981 to 1983 "was the worst

Case: 21-70087, 09/08/2026, ID: 12957012, DktEntry: 86-1, Page 12 of 22



during the war" and "resulted in the killing of thousands of civilians each year." The IJ then made a specific finding that the "atrocities" committed by the Atonal Battalion "were taken on . . . account of imputed political opinions of the deceased, the harmed, persecuted people." Taken together, this evidence was "sufficient to raise the inference" of Perez's "personal involvement and purposeful assistance" in the persecution of others on account of their political opinion. *Miranda Alvarado v. Gonzales*, 449 F.3d 915, 927, 930 (9th Cir. 2006). Once that inference was raised, Perez had "the burden of proving by a preponderance of the evidence that" the persecutor bar "do[es] not apply." 8 C.F.R. § 1240.8(d); *see also Miranda Alvarado*, 449 F.3d at 930. In light of the IJ's determination that Perez was not credible, which Perez does not challenge in this petition, substantial evidence also supports the conclusion that he is statutorily ineligible for NACARA cancellation of removal. *See Miranda Alvadado*, 449 F.3d at 932. We identify no error in the IJ's application of the persecutor bar.

We need not decide whether our interpretation of the evidentiary standard conflicts with that of the BIA. *Compare Miranda Alvarado*, 449 F.3d at 928, *with Matter of D-R*, 27 I. & N. Dec. 105, 120 (B.I.A. 2017); *see also Auer v. Robbins*, 519 U.S. 452, 461 (1997) (holding that an agency's interpretation of its own ambiguous regulation is "controlling unless 'plainly erroneous or inconsistent with the regulation.'" (citation modified)). The government has cleared the evidentiary threshold under both the BIA's evidentiary standard and ours.

### II. The Import of the Implied Duress Defense

Whether an implied duress defense nonetheless forecloses the IJ's decision presents the dispositive issue in

Case: 21-70087, 09/08/2026, ID: 12957012, DktEntry: 86-1, Page 13 of 22



this petition for review. To answer that question, we must consider what weight to give to the Attorney General's decision in *Negusie II*. We must also decide whether the "best" reading of the persecutor bar reveals an implied duress defense, in view of "all relevant interpretive tools" available to us when we interpret an ambiguous statute. *Loper Bright*, 603 U.S. at 400.

We start with the issue of weight, which is part of *Negusie*'s DNA. When the Supreme Court decided that case, it explained that the question of "[w]hether [the BIA's] interpretation [is] reasonable, and thus owed *Chevron* deference," was "a legitimate question" that was nonetheless not before the Court. *Negusie*, 555 U.S. at 521. Because the BIA had "not yet exercised its *Chevron* discretion to interpret the statute in question" and had instead merely determined that the Court's prior decision in *Fedorenko v. United States*, 449 U.S. 490 (1981), controlled, the Court remanded to the BIA with instructions to address the existence of a duress defense to the persecutor bar in the first instance. *Id.* at 522–24.

That *Chevron* discretion is no more. After the Supreme Court's decision in *Loper Bright*, we "may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Loper Bright*, 603 U.S. at 413. We must instead "exercise [our] independent judgment in deciding whether an agency has acted within its statutory authority." *Id.* at 412. We may still consider an agency's interpretation of a statute, but its weight in our review "depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). The power to persuade is

the "only" power that agency interpretations have. *Murillo-Chavez v. Bondi*, 128 F.4th 1076, 1086–87 (9th Cir. 2025). We may merely "look to [them] for guidance." *Lopez v. Garland*, 116 F.4th 1032, 1036 (9th Cir. 2024).

Agency interpretations generally may, as here, merit some limited weight. *See United States v. Mead Corp.*, 533 U.S. 218, 228 nn.7–10, 234–35 (2001) (collecting cases and describing contexts where "an agency's interpretation may merit *some* deference" under *Skidmore* (emphasis added)). We need not specify "the exact molecular weight . . . we accord to" the Attorney General's position. *Cmty. Health Ctr. v. Wilson-Coker*, 311 F.3d 132, 137–38 (2d Cir. 2002). The rule in *Skidmore* represents a spectrum, and not a switch.

The aspects of the *Negusie II* decision that give it the "power to persuade" are the thoroughness of the Attorney General's analysis, *Skidmore*, 323 U.S. at 140, its "reasoned consideration" of the relevant issues, *Lemus-Escobar v. Bondi*, 158 F.4th 944, 960 (9th Cir. 2025) (quoting *Lopez*, 116 F.4th at 1039), and the Justice Department's "relative expertness" in light of its "experience and informed judgment" in enforcing federal immigration law, *Mead*, 533 U.S. at 227–28 (quoting *Bragdon v. Abbott,* 524 U.S. 624, 642 (1998)). Put differently, interpreting the INA is what the Attorney General does as an adjudicator, *see Kucana v. Holder*, 558 U.S. 233, 239 (2010); 8 U.S.C. § 1103(g)(2); 8 CFR § 1003.1, and this particular interpretation is no throwaway analysis. We especially credit the Attorney General's reasoned consideration of the Supreme Court's view that there is "substance" to the contention that "persecution presumes moral blameworthiness," even if it is a view with which he ultimately disagrees. *Negusie*, 555 U.S. at 517–18 (citation modified); *Negusie II*, 28 I. & N. Dec. at 143–49. We likewise credit him for considering

seriously the Supreme Court's instruction that the Refugee Act was designed "to implement the principles agreed to in the 1967 United Nations Protocol Relating to the Status of Refugees . . . as well as the United Nations Convention Relating to the Status of Refugees." *Negusie*, 555 U.S. at 520 (quoting *I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 427 (1999) (citation modified)); *Negusie II*, 28 I. & N. at 138–43.

But the government's diametrically opposed interpretations in *Negusie I* and *Negusie II* make the position it now takes less persuasive. *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 33 F.4th 1202, 1216–17 (9th Cir. 2022) (giving "limited weight" to an agency opinion letter because of two "inconsistent positions" taken by the government four years apart); *cf. I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987) ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." (quoting *Watt v. Alaska*, 451 U.S. 259, 273 (1981)).[1] The government is of

[1] We reject the argument that the lack of consistency between the government's two interpretations of the persecutor bar makes *Negusie II* arbitrary and capricious for its failure to consider serious reliance interests. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020). The Attorney General considered the "experience[s]" of noncitizens affected by his interpretation of the persecutor bar, including those "who have escaped from severe circumstances in their home countries" and "endured unimaginable harm themselves." *Negusie II*, 28 I. & N. Dec. at 151–52 (citation modified). He then concluded that the "absence of a duress exception . . . does not mean that an alien who assisted in persecution under duress will necessarily lack protection." *Id.* at 152. In fact, the Attorney General noted, the persecutor bar does not foreclose a noncitizen's ability to obtain deferral of removal under the Convention Against Torture. *Id.*

course permitted to change its interpretation of a statute, but we typically require a "rational explanation for [an agency's] sudden decision" to make that switch. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 933 (9th Cir. 2008). While these inconsistencies do not render the government's most recent view irrelevant, they certainly make its claim to "respect" weaker. *See Mead*, 533 U.S. at 235. We therefore accord the Attorney General's interpretation of the persecutor bar limited weight.

We nonetheless conclude that the best reading of the persecutor bar, the one to which we arrive as "if no agency were involved," *Loper Bright*, 603 U.S. at 373, is that the bar contains no implied duress defense.

## III. Statutory Analysis of the Persecutor Bar

The ambiguity of the persecutor bar presents no license to leave the text of the statute behind. The INA provides, repeatedly, that most immigration relief remains unavailable to any person who "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42), 1158(b)(2)(A)(i); *see also id.* § 1231(b)(3)(B)(i). A "hard interpretive conundrum[] . . . can often be solved," *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019), by reading the statute's words "in their context and with a view to their place in the overall statutory scheme," *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)). In the end, this conundrum proves not to be especially hard.

The "everyday understanding" of undefined statutory terms "count[s] for a lot" in this instance. *Lopez v. Gonzales*, 549 U.S. 47, 53 (2006). The ordinary meanings of "assisted"

and "otherwise participated" at the time of the enactment of both the Refugee Act and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") implicate a range of conduct, some of which may be involuntary or unintended. *See Assist*, Black's Law Dictionary (5th ed. 1979) ("To help; aid; succor; lend countenance or encouragement to; participate in as an auxiliary. To contribute effort in the complete accomplishment of an ultimate purpose intended to be effected by those engaged."); *Assist*, Black's Law Dictionary (6th ed. 1990) (same); *Participate*, Black's Law Dictionary (5th ed. 1979) ("To receive or have a part or share of; to partake of; experience in common with others; to have or enjoy a part or share in common with others. To partake, as to 'participate' in a discussion, or in a pension or profit sharing plan."); *Participate*, Black's Law Dictionary (6th ed. 1990) (same). The fact that "otherwise" modifies "participate" also suggests that its meaning resembles that of the verbs that precede it, for "by using the word 'otherwise' the writer draws a substantive connection between two sets only on one specific dimension—*i.e.,* whatever follows 'otherwise.'" *Begay v. United States*, 553 U.S. 137, 151 (2008) (Scalia, J., concurring).[2]

It is therefore a commonsense conclusion that an applicant who has involuntarily contributed effort in the accomplishment of persecution intended by another may have nonetheless "assisted" in persecution. The persecutor bar's four verbs—"ordered, incited, assisted, or otherwise

[2] No one here argues, and the Court in *Negusie* did not hold, that an applicant could have involuntarily "ordered" or "incited" persecution under the INA. 8 U.S.C. § 1231(b)(3)(B)(i); *see also Negusie*, 555 U.S. at 517. We accordingly do not address the matter here.

participated"—"with their overlapping but distinct meanings, reflect Congress's effort to capture a range of . . . conduct," *United States v. Williams*, 172 F.4th 791, 799 (9th Cir. 2026), marked by the requisite "individual accountability," *Vukmirovic v. Ashcroft*, 362 F.3d 1247, 1252 (9th Cir. 2004), regardless of the voluntary or involuntary nature of the conduct.

Congress's amendments to provisions that neighbor the persecutor bar likewise support our conclusion. The enactment of IIRIRA added a provision to Section 1158, which allows for a previous grant of asylum to be terminated if "the alien has *voluntarily* availed himself or herself of the protection of the alien's country of nationality" by returning to it under certain circumstances. 8 U.S.C. § 1158(c)(2)(D) (emphasis added). Congress did not add the term "voluntary" to the version of the persecutor bar that appears in Section 1158 when it made that amendment. We generally presume that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it . . . [does so] intentionally and purposely in the disparate inclusion or exclusion." *Cardoza-Fonseca*, 480 U.S. at 432 (citation modified).

The panoply of clear exceptions in the INA that speak of voluntariness also reinforces the conclusion that Congress's omission in this provision is no accident. For instance, the INA bars relief for any noncitizen who "voluntarily fails to depart" after receiving "permi[ssion]" to do so within a specified time. 8 U.S.C. § 1229c(d)(1); *Singh v. Holder*, 658 F.3d 879, 887–88 (9th Cir. 2011) (Section 1229c(d)(1) provides a "narrow exception to the penalties for failure to comply with an order of voluntary departure" available to a noncitizen who, "through no fault of his or her own, is unaware of the . . . order or is physically unable to depart."

Case: 21-70087, 09/08/2026, ID: 12957012, DktEntry: 86-1, Page 19 of 22



(citation modified)). The statute also provides an exception to deportability that results from the applicant's failure to provide notice of change of address, if "the alien establishes . . . that such failure . . . was not willful." 8 U.S.C. § 1227(a)(3)(A). Similarly, a person otherwise barred from naturalization on account of membership in any "totalitarian party of the United States" may claim an exception to that bar if she "establishes that such membership or affiliation is or was involuntary." *Id.* § 1424(a)(2), (d). The INA also provides a list of expatriation acts that a "national of the United States" could undertake to "lose his nationality" and creates a presumption of voluntariness that the national may rebut "upon a showing, by a preponderance of the evidence, that the act or acts committed or performed were not done voluntarily." *Id.* § 1481. That Congress specifically made voluntariness a condition elsewhere but not here underscores that it did not intend for duress to be available as a defense to persecutors.

## IV. Statutory History and International Law

Perez and amici rely on the relationship between the statutory history of the persecutor bar and a substantial body of international refugee law to urge us to acknowledge an implied duress defense in this circumstance. *See, e.g.*, Brief for Scholars of International Refugee Law as Amicus Curiae Supporting Petitioner at 5–9, Dkt. No. 23.[3] Indeed, the drafting history of the persecutor bar suggests that Congress intended that "determinations be made on a case-by-case basis in accordance with the case law that has developed under the [relevant sections of the Act], as well as international material on the subject such as the opinions of

[3] Amici have capably discharged their responsibilities, and we thank them for their substantial efforts.

the Nuremberg tribunals." H.R. Rep. No. 95-1452, at 7 (1978). One of Congress's primary purposes in passing the Refugee Act was to implement the principles agreed to in the United Nations Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 (entered into force Apr. 22, 1954) ("Convention"), and the United Nations Protocol Relating to the Status of Refugees, opened for signature Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267 (entered into force Oct. 4, 1967; for the United States Nov. 1, 1968) ("Protocol"). *See Negusie*, 555 U.S. at 520. The United States is party to the Protocol, which binds it to "the substantive provisions of Articles 2 through 34 of the [Convention]." *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 551 (9th Cir. 1990).

The Convention's persecutor bar is found in Article 1F(a), and it excludes an individual from refugee protection where "there are serious reasons for considering that . . . he has committed a crime against peace, a war crime, or a crime against humanity, as defined in the international instruments drawn up to make provision in respect of such crimes." Convention art. 1F(a). Foreign courts construing Article 1F(a) have spoken in terms of individual responsibility and voluntary contribution. *See, e.g.*, *Ezokola v. Canada (Citizenship & Immigr.)*, [2013] 2 S.C.R. 678, ¶ 36 (Can.) (requiring "voluntary, knowing, and significant contribution to the crime or criminal purpose of a group"); *cf.* Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* ("United Nations Handbook") ¶ 149 (Geneva, 1992) (advising that the Convention's exclusion clauses should be applied restrictively given the "serious consequences of exclusion").

International law is no ornament here. We may not construe "an act of Congress . . . to violate the law of nations if any other possible construction remains." *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804) (Marshall, C.J.).

This impressive range of materials helps in part to explain why a duress exception is a possible reading, and why the Court in *Negusie* refused to treat its prior decision in *Fedorenko* as controlling. *See Negusie*, 555 U.S. at 520 ("Unlike the [Displaced Persons Act], which was enacted to address not just the postwar refugee problem but also the Holocaust and its horror, the Refugee Act was designed to provide a general rule for the ongoing treatment of all refugees and displaced persons."). Unfortunately for Perez, however, it does not require the conclusion that he seeks. The Protocol is not self-executing and does not independently create any private and enforceable rights. *I.N.S. v. Stevic*, 467 U.S. 407, 417–18, 428 n.22 (1984) ("[T]he Protocol [is] largely consistent with existing law."). The United Nations Handbook is "a useful interpretive aid, but it is not binding on . . . United States courts." *Aguirre-Aguirre*, 526 U.S. at 427. Perez and amici demonstrate why they think that a duress defense may be sensible, but not that Congress wrote the defense into law. Because a duress defense would be inconsistent with the statute's plain text, the *Charming Betsy* canon does not warrant a different conclusion.

In light of the unchallenged adverse credibility determination, we do not address what conduct counts as assistance or participation in persecution. As the Supreme Court has observed, the persecutor bar's ambiguity poses "difficult line-drawing problems," *Fedorenko*, 449 U.S. at 512 n.34, and it is a valid concern that "a literal interpretation

of [it] would bar every Jewish prisoner who survived Treblinka because each one of them assisted the SS in the operation of the camp," *id.* at 511 n.33 (citation modified); *see also Vukmirovic*, 362 F.3d at 1252 ("Mere acquiescence or membership in an organization is insufficient to trigger the deportability provision . . . . Active personal involvement in persecutorial acts needs to be demonstrated before deportability may be established." (citation modified)). This petition does not implicate that valid concern. The absence of a duress defense does not, for example, relieve an immigration judge of the responsibility "to conduct a sufficiently particularized evaluation to determine the petitioner's responsibility for persecution committed by other[s]" when the government raises the inference that the petitioner has assisted in persecution. *Miranda Alvarado*, 449 F.3d at 926. As always, the answers to difficult questions posed in a petition for review that involves the persecutor bar lie "not in 'interpreting' the [INA] to include a voluntariness requirement that the statute itself does not impose, but in focusing on whether particular conduct can be considered assisting in the *persecution* of civilians." *Fedorenko*, 449 U.S. at 512 n.34. Our interpretation of the statute, plus the extensive unchallenged credibility findings, result in denial of this petition.

**PETITION DENIED.**